NOT FOR PUBLICATION

UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF NEW JERSEY

| | |
|---|---|
| RORY RIGGS,<br><br>                    Plaintiff,<br><br>vs.<br><br>DEUTSCHE BANC ALEX. BROWN INC.,<br>DEUTSCHE BANK SECURITIES INC., and<br>DB ALEX. BROWN LLC,<br><br>                    Defendants. | Civ. No. 02-3124 (WGB)<br><br>**M E M O R A N D U M<br>O P I N I O N<br>and<br>O R D E R** |

APPEARANCES:

Robert J. Gilson, Esq.
Khaled J. Klele, Esq.
RIKER, DANZIG, SCHERER, HYLAND & PERRETTI LLP
Headquarters Plaza
One Speedwell Avenue
Morristown, New Jersey 07962

    Attorneys for Plaintiff

Frank C. Testa, Esq.
George William McClellan, Esq.
MORGAN, LEWIS & BOCKIUS LLP
502 Carnegie Center
Princeton, New Jersey 08540

    Attorneys for Defendants

**BASSLER, SENIOR DISTRICT JUDGE:**

Plaintiff Rory Riggs has filed two motions *in limine*: (1) to preclude defendant Deutsche Bank[1] from introducing evidence or

---

[1] DB Alex. Brown LLC merged into Deutsche Bank Securities, Inc., forming Deutsche Banc Alex. Brown, Inc. Subsequently, Deutsche Banc Alex. Brown changed its name back to Deutsche Bank Securities, Inc. As the three defendants appear to be the same entity, the Court will refer to them collectively as "Deutsche Bank."

suggesting to the jury that Riggs was trying to avoid paying taxes or was trying to manipulate the Merger consideration; and (2) to preclude Deutsche Bank from referencing Riggs's wealth. Deutsche Bank opposes both motions.

Deutsche Bank has filed two *in limine* motions of its own: (1) to exclude all argument, testimony, and other evidence relating to Rule 144 of the Securities and Exchange Commission ("SEC"); and (2) to bar stock prices offered by Riggs to establish damages in excess of his out-of-pocket loss on December 21, 2000. Riggs opposes both of these motions.

**I.   RIGGS'S MOTION TO PRECLUDE EVIDENCE OF TAX MOTIVES**

In his first *in limine* motion, Riggs requests that the Court "preclude Defendant [Deutsche Bank] from stating or suggesting to the jury that Mr. Riggs was 'avoiding taxes' or 'manipulating the merger consideration.'" (Pl.'s Moving Br. at 11.) According to the parties' joint stipulation of facts, Riggs held Biomatrix shares in five locations. (Joint Final Pretrial Order, Stipulation of Facts ¶ 32.) Prior to the merger, Riggs contacted the Exchange Agent and requested that all the cash he would receive in the merger between Biomatrix and Genzyme Biosurgery be wired to his Smith Barney account. (Id. ¶ 33.) The rest of the accounts were to receive Genzyme Biosurgery ("GZBX") shares on "a share for share basis." (Id.) Duetsche Bank intends to offer evidence that Riggs was "manipulating the Merger consideration"

in order to receive "favorable tax treatment pursuant to section 1202 of the Internal Revenue Code."  (Id., Def.'s Contested Facts ¶ 30.)

Riggs asserts that, under Fed. R. Ev. 403, the relevance of any reference to his tax-related motives is substantially outweighed by the danger of prejudice in presenting those motives to the jury.  The Court disagrees.

First, Riggs offers no law in support of this conclusion.  Moreover, he does not even offer any analysis.  The Court is not persuaded by his conclusory statements that he would be "substantially prejudiced" by the admission of evidence regarding his tax-related motives.

Second, the Court will not preclude the evidence simply because Riggs acted within the law.  Riggs argues that because he was entitled to employ Section 1202 of the tax code, his tax reasons for restructuring the Merger consideration should not be mischaracterized by Deutsche Bank.  However, Deutsche Bank does not intend to characterize Riggs's actions as illegal or as a form of tax evasion.  Rather, Deutsche Bank argues that Riggs's tax motives are relevant and necessary to understand Riggs's request of the Exchange Agent.  According to Deutsche Bank, the request was highly unusual.[2]  The Court agrees that the tax

---

[2] In fact, the reorganization department manager of the Exchange Agent testified that such a request was "uncommon" and that no other investor had made a similar request in her 20-year

3

motives behind the request will aid the jury in understanding the circumstances giving rise to the claims in this lawsuit. In addition, the motives may shed light as to whether and why Deutsche Bank misunderstood the instructions given by Riggs during the crucial period between December 15 and December 21, 2000. Therefore, the Court denies Riggs's motion *in limine* to preclude Deutsche Bank from offering evidence regarding the tax incentives to restructure the Merger consideration. Nonetheless, the Court notes that the use of the term "manipulate" carries a pejorative connotation. In light of Deutsche Bank's representation that it does not intend to imply that Riggs's tax motives were improper or illegal, the Court precludes the use of the term "manipulate" to describe Riggs's allocation of the merger consideration.

**II.   RIGGS'S MOTION TO PRECLUDE EVIDENCE OF WEALTH**

Various documents in this litigation include information regarding Riggs's wealth. For example, a Branch Credit Line Request Form dated September 16, 1996 indicates that Riggs had a net worth of over $5,000,000 prior to opening his account with Deutsche Bank. Riggs argues that his wealth is irrelevant to the litigation and that any possible relevance is substantially outweighed by the danger of prejudice that the presentation of

---

career. (Testa Cert., Ex. A, 6/17/03 Trotman-Innis Dep., at 60-61, 65.)

4

such documents would cause. Therefore, Riggs requests that the Court preclude Deutsche Bank from referencing his wealth.

Riggs offers no support for the proposition that his wealth is irrelevant or too prejudicial. On the other hand, the duties owed by Deutsche Bank to Riggs are important in this case. The scope of those duties will depend in part on the sophistication of Riggs as an investor. See <u>Leib v. Merrill Lynch, Pierce, Fenner & Smith, Inc.</u>, 461 F. Supp. 951, 953 (E.D. Mich. 1978) ("the precise manner in which a broker performs [duties owed to nondiscretionary accountholders] will depend to some degree upon the intelligence and personality of his customer"). One factor in determining the sophistication of the investor is his wealth. In <u>De Kwiatkowski v. Bear, Stearns & Co.</u>, 306 F.3d 1293 (2d Cir. 2002), the Second Circuit Court of Appeals evaluated whether a broker owed more than limited duties to an investor with a nondiscretionary account. The Second Circuit concluded that the investor's "vast wealth, his trading experience, his business sophistication, and his gluttonous appetite for risk . . . weigh[ed] strongly against - and not at all in favor of - heightened duties on the part of the broker." <u>Id.</u> at 1309.

Similarly, in <u>Myers v. Finkle</u>, 950 F.2d 165, 168 (4th Cir. 1991), the Fourth Circuit Court of Appeals addressed whether a investor justifiably relied upon the oral representations of a broker that conflicted with contemporaneous written statements in

5

the investor's possession. In making this determination, a court looks to the sophistication of the investor. Id. at 167. The Fourth Circuit held that wealth is an important, though not the only, factor in evaluating the sophistication of the investor. Id. at 168.

Finally, in Crigger v. Fahnestock, No. 01-Civ.-781, 2005 U.S. Dist. LEXIS 5865, at *6 (Apr. 6, 2005), the Southern District of New York overruled a Rule 403 objection to the admission of evidence regarding plaintiffs' wealth as indicative of investor sophistication. That court concluded that although wealth is not determinative of sophistication, it is one of many factors for the jury to consider. See id.

The Court agrees with the majority of the case law that has addressed this issue. The scope of the duties owed by Deutsche Bank will be determined in part by Riggs's sophistication, intelligence, and personality. In turn, these characteristics can be inferred from Riggs's wealth. Therefore, the Court denies Riggs's *in limine* motion to preclude evidence regarding his wealth.

**III. DB'S MOTION TO PRECLUDE EVIDENCE OF SEC RULE 144**

Deutsche Bank moves to preclude any argument, testimony, or other evidence relating to Rule 144 of the Securities and Exchange Commission. Section 5 of the Securities Act of 1933 requires that securities be registered with the SEC prior to

their sale.  15 U.S.C. § 77e(a).  This general requirement is subject to various exemptions.  For example, Section 4(1) of the Securities Act exempts all transactions by persons who are not issuers, underwriters, or dealers.  15 U.S.C. § 77d(1).

Rule 144 addresses circumstances in which a person selling restricted securities held by an "affiliate" of the issuer of the securities will be "deemed not to be engaged in a distribution and therefore not underwriters."  As Rule 144 states, where a person attempts to sell a non-exempt security, that security must be registered unless a statutory exemption covers the transaction.  Four exemptions can be found in Section 4 of the Securities Act; however, three of the four exemptions are not available to anyone acting as an "underwriter" of securities.  Therefore, Rule 144 seeks to clarify which persons are underwriters.  Persons that comply with the provisions of Rule 144 will be deemed not to have engaged in a distribution of securities, in which case they are not underwriters.  In other words, if a person acts in accordance with Rule 144, then they will not violate Section 5 of the Securities Act.

Riggs intends to introduce argument and evidence that Deutsche Bank failed to comply with Rule 144 and thereby violated Section 5.  If Deutsche Bank had complied with Rule 144, argues Riggs, Deutsche Bank would have notified him of the loan to Ferris Baker & Watts ("FBW") prior to December 21, 2000.  Riggs

7

argues that he never would have signed the registration of the stock, thereby preventing Deutsche Bank from ever (legally) loaning the 94,000 shares to FBW.  Following this line of reasoning, the requirements of Rule 144 would have precipitated an entire exchange between Riggs and Deutsche Bank, which would have avoided the miscommunication that occurred on December 21, 2000 when Riggs first learned of the loan.

It is undisputed that Deutsche Bank did not comply with Rule 144.  However, failure to comply with Rule 144 does not create a *per se* violation of Section 5 of the Securities Act.  As the Seventh Circuit Court of Appeals has stated, "It is not possible to 'violate' Rule 144."  <u>Buck v. U.S. Digital Communications</u>, 141 F.3d 710, 712 (7th Cir. 1998) (Easterbrook, J.).  Rather, the rule is a "safe-harbor" regulation issued by the SEC.  <u>Id.</u>  The Seventh Circuit further explains,

> Although compliance with Rule 144 negates the possibility of a "distribution," noncompliance with the Rule's terms does not mean that there has been a "distribution."  Investors and their customers may take advantage of any exemption under § 4 of the Act whether or not they qualify for the Rule 144 safe harbor; the alternatives are more risky, but none the less lawful.

<u>Id.</u>  Therefore, evidence that Deutsche Bank did not make use of the Rule 144 safe harbor provision does not demonstrate a violation of Section 5 of the Securities Act.  Even assuming that a "loan" of securities to another broker is considered a sale for the purposes of Section 5, Deutsche Bank may have taken advantage

of a different exemption under the Securities Act. Thus, the relevance of Rule 144 to this litigation is tenuous at best.

In addition, the introduction of evidence regarding Rule 144 would be unfairly prejudicial to Deutsche Bank and confusing to the jury. Failure to comply with Rule 144 is not itself a violation of the Securities Act.[3] Any implication that Deutsche Bank violated the federal securities laws simply because it did not make use of Rule 144 is incorrect. Thus the probative value of the evidence is substantially outweighed by the danger that unfair prejudice would result from its admission.

Furthermore, introduction of this evidence may have the effect of confusing the jury: this case is not about violations of Section 5. This case revolves around a conference call between Riggs and officers of Deutsche Bank held on December 21, 2000 and whether Deutsche Bank failed to properly execute the instructions given by Riggs during that call. Riggs has stated causes of action for violation of 10(b) of the Securities Exchange Act of 1934, fraud, breach of contract, negligence, and negligent supervision. The admission of evidence attempting to prove Deutsche Bank's violation of Section 5 of the Securities Act would only confuse the jury as to the actual claims at issue in this case.

---

[3] Furthermore, Riggs has not demonstrated to the Court that Deutsche Bank failed to meet any other exemptions of the Act.

Because "the probative value is substantially outweighed by the danger of unfair prejudice, confusion of the issues, or misleading the jury," Fed. R. Evid. 403, the Court grants Deutsche Bank's motion to preclude argument and evidence regarding Rule 144 of the SEC.

**IV.   DB'S MOTION TO PRECLUDE EVIDENCE OF STOCK PRICES**

Finally, Deutsche Bank moves to bar Riggs from offering evidence of the stock price of GZBX after December 21, 2000. According to his trial brief, Riggs intends to offer into evidence the value of GZBX stock at three different dates in order to establish the amount of damages: (1) May 9, 2001, the date he closed his Deutsche Bank account; (2) August 15, 2002, the date he filed his first amended complaint in this action; and (3) June 30, 2003, the date Genzyme purchased all outstanding GZBX stock.  (Pl. Trial Br. at 30-31.)

Deutsche Bank argues that, pursuant to Fed. R. Evid. 402, the value of GZBX stock after December 21, 2000 is inadmissible because it is irrelevant.  Deutsche Bank contends that where a plaintiff seeks damages for breach of contract, as here, the damages are calculated based upon the difference between the price received for the sale of the securities and the actual value of the securities on the date of the breaching event or transaction.  According to Deutsche Bank, the date of the breaching event or transaction was December 21, 2000; therefore,

10

Riggs's damages should be calculated as of that date. Any other future stock price would be irrelevant.

In his opposition, Riggs does not address the three dates he raised for calculating damages in his trial brief.[4] Instead, he argues that Deutsche Bank incorrectly recognizes December 21, 2000 as the date for measuring damages. Although the merger consideration was supposed to be distributed on December 21, 2000, Riggs notes that he did not actually receive the 94,000 GZBX shares loaned out by Deutsche Bank until December 28, 2000. Consequently, Riggs uses December 28, 2000 as the date to measure damages.

The parties do not dispute that, if he establishes liability, Riggs is only entitled to actual damages, or out-of-pocket losses.

The date of the breach is December 21, 2000, the date Riggs allegedly should have received cash consideration for all 200,000 of his shares in his Deutsche Bank account. Under Maryland law,

> The damages allowed for breach of a contract should compensate the injured person for the loss he has sustained as a result of the breach. The court should endeavor to place the injured person, as far as possible by monetary award, in the position in which he would have been, if the contract had been properly performed.

---

[4] Riggs does not respond to Deutsche Bank's argument that the date he closed his account, the date he filed his lawsuit, and the date Genzyme purchased all outstanding GZBX shares are irrelevant. In fact, Riggs does not even mention these dates in his opposition.

11

Millison v. Ades of Lexington, Inc., 262 Md. 319, 323, 277 A.2d 579, 582 (1971) (quoting Casualty Ins. Co. v. Messenger, 181 Md. 295, 29 A. 2d 653 (1943)).  In this case, in order to place Riggs in the position he would have received in had the contract not been breached, the Court would have to award him the difference between what he was entitled to receive on December 21, 2000 and what he actually received.  The stock price of on December 21, 2000 is therefore relevant to determine what Riggs would have received had the contract not been breached.

As for what Riggs actually received, the parties dispute the correct date to measure this amount.  Deutsche Bank claims that Riggs received the 94,000 loaned-out shares on December 21, 2000; accordingly, any future stock price would be irrelevant.  On the other hand, Riggs claims that he did not receive those 94,000 shares until December 28, 2000, in which case evidence of the stock price on that date would be relevant.  Because this is a factual issue, the Court will leave it to the jury to determine whether Riggs received his compensation on December 21 or December 28.  Unless the course of the trial indicates that this is not a factual issue in dispute, the Court will allow evidence of the stock price on both dates.

However, Riggs has not presented an argument that the stock price on May 9, 2001, August 15, 2002, or June 30, 2003 is relevant to the computation of damages.  Therefore, the Court

12

grants Deutsche Bank's motion *in limine* to the extent that it seeks to preclude evidence of the stock price of GZBX on any date after December 28, 2001.

    **SO ORDERED.**

                                            /s/ William G. Bassler
                                         WILLIAM G. BASSLER, U.S.S.D.J.

Dated: September 6, 2005